UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-329(JNE/FLN)

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. GREEN WAVE
   TELECOMMUNICATION, Sdn Bhn,
2. ALIREZA JALALI, and
3. NEGAR GHODSKANI,
   a/k/a Negar Kani,

Defendants,

**RECEIVED**

MAY 1 7 2016

CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

## AFFIDAVIT IN SUPPORT OF REQUEST
## FOR EXTRADITION OF NEGAR GHODSKANI, a/k/a NEGAR KANI

1.      I, Charles J. Kovats, Jr., being duly sworn, state that: I am a citizen of the United States of America (United States) and a resident of the State of Minnesota. I submit this affidavit in support of the request by the United States for the extradition of defendant Negar Ghodskani (Ghodskani), also known as (a/k/a) Negar Kani from Australia to the United States for the purpose of prosecuting her on the charges contained in the indictment filed in the United States District Court for the District of Minnesota in Criminal Case No. CR15-00329-JNE-FLN, charging defendants Green Wave Telecommunication, Sdn Bhn, Alireza Jalali, and Ghodskani with violations of U.S. law.

2.      This affidavit is organized as follows:

SCANNED
MAY 1 9 2016
U.S. DISTRICT COURT MPLS

SCANNED
AUG 0 9 2017
U.S. DISTRICT COURT ST. PAUL

1

    a.      Part I contains a recitation of my background and experience in the area of criminal prosecution in the United States, as well as a brief description of my duties and responsibilities as an Assistant United States Attorney.

    b.      Part II sets forth the facts supporting the indictment filed in Criminal Case No. CR15-00329-JNE-FLN, relating to unlawful activity engaged in by Ghodskani.

    c.      Part III sets forth the law and the charges pertaining to the indictment filed in Criminal Case No. CR15-00329-JNE-FLN, relating to unlawful activity engaged in by Ghodskani.  It is subdivided as follows:

        (A)      Charging Process;
        (B)      Procedural History of the Case;
        (C)      Charges, Penalties, and Pertinent United States Law;
        (D)      Statute of Limitations; and
        (E)      Status of the Case.

    d.      Part IV sets forth descriptive information relating to Ghodskani.

    e.      Part V is an index and certification of the exhibits attached to this affidavit.

## Part I

## Legal Background

3.      I graduated from the University of San Francisco School of Law in 1996, and was admitted to the California State Bar in that same year.  Since September 2005 to the present, I have been employed by the United States Department of Justice as an Assistant United States Attorney.  My service as an Assistant United States Attorney began in the Central District of California, where I was employed for nearly five years.  In June 2010, I moved geographically to the District of Minnesota where I have remained employed as an Assistant United States

Attorney.  My duties are to prosecute persons charged with criminal violations of the laws of the United States.   During my tenure as an Assistant United States Attorney, I have become knowledgeable about the criminal laws and procedures of the United States.

4.      In the course of my duties, I have become familiar with the charges and evidence in the case of <u>United States v. Green Wave Telecommunication, Sdn Bhn, Alireza Jalali, and Negar Ghodskani, a/k/a Negar Kani</u> (Criminal Case No. CR15-00329-JNE-FLN).  These charges arose out of an investigation conducted by the Federal Bureau of Investigation, the Department of Commerce, and the Department of Homeland Security.  This investigation revealed that from approximately August 2010 to December 2012, Ghodskani and her co-conspirators, representing themselves as employees of Malaysia-based Green Wave Telecommunication, conspired to unlawfully acquire controlled technology, specifically converters, analog devices and synthesizers, from United States companies.  Once acquired from United States companies, Ghodskani and her co-conspirators then re-shipped the controlled technology to Tehran, Iran, in further violation of United States law.

### Part II
### Factual Basis

A.      **Legal Background**

5.      The Wassenaar Arrangement (WA) is an international multilateral export control regime consisting of 41 countries that was established in 1996 and is the successor to the Cold War-era Coordinating Committee for Multilateral Export Controls (COCOM).  The WA was established by its member countries, including the United States and Australia, to contribute to regional and international security and stability by promoting transparency and greater responsibility in transfers of conventional arms and dual-use goods and technologies.

3

Participating countries establish their own laws, regulations, and policies, to ensure that transfers of conventional arms and dual-use goods and technologies do not contribute to the development or enhancement of military capabilities which undermine these goals, and are not diverted to support such capabilities.  Representatives of participating countries meet regularly in Vienna, Austria, to discuss which military and dual-use items should be added or removed from the WA's List of Dual-Use Goods and Technologies and the Munitions List.  Member countries then generally model their national export control lists after the WA control lists to regulate the export of items agreed to by the member countries.  At all times relevant to the Indictment in this case, the converters discussed herein were on the WA's List of Dual Use Goods and Technologies.

6.      Under the International Emergency Economic Powers Act (IEEPA), the President of the United States is granted the authority to deal with unusual and extraordinary threats to the national security, foreign policy, and economy of the United States.  Under IEEPA, the President can declare a national emergency through executive orders that have the full force and effect of law.

7.      On August 17, 2001, under the authority of IEEPA, the President issued Executive Order 13222, which declared a national emergency with respect to the unrestricted access of foreign parties to United States goods and technologies.  This national emergency has been extended by successive Presidential Notices, the most recent being that of August 7, 2015, continuing the Export Administration Regulations (the EAR) in effect under IEEPA.  Through the EAR, the U.S. Department of Commerce (DOC) imposes license or other requirements before an item subject to the EAR can be lawfully exported from the United States or lawfully re-exported from another country.  These items are listed on the Commerce Control List (CCL).

8.      Pursuant to its authority derived from IEEPA, the DOC reviews and controls the export of certain goods and technologies from the United States to foreign countries.   In particular, the DOC has placed restrictions on the export of goods and technologies that it has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.

9.      The DOC issued a certified license determination declaring that, at all times relevant to the Indictment in this case, the converters discussed herein were designated on the CCL at ECCN 3A001, and were controlled for export from the United States for national security and anti-terrorism reasons.

10.     Beginning in 1995, by Executive Orders and pursuant to the authority in IEEPA, the President of the United States imposed such sanctions on Iran.  Executive Orders authorized the U.S. Secretary of the Treasury, in consultation with the U.S. Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders.  Pursuant to this authority, the U.S. Secretary of the Treasury has promulgated the Iranian Transactions and Sanctions Regulations (ITSR), implementing the sanctions imposed by Executive Orders.

11.     Under the ITSR:

a.      No goods, technology or services may be exported, re-exported, sold, or supplied to Iran, directly or indirectly from the United States or by a United States person, wherever located, without authorization from the United States Government; and

b.   Any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, causes a violation of, or that attempted to violate, any of the ITSR, is prohibited.

12.     At all times relevant to the Indictment in this case, a license was required from the U.S. Department of the Treasury to export to Iran the analog devices, converters, and synthesizers.  Additionally, a license was also required from the DOC to export the converters to Malaysia.

13.     The U.S. Census Bureau (Census) and the DOC, at all times relevant hereto, through the Foreign Trade Regulations (FTR), required filing of electronic export information (EEI) through the Automated Export System (AES), which is jointly administered by the United States Department of Homeland Security (DHS), Customs and Border Protection (CBP), Census, and other U.S. Government agencies.   The purpose of the FTR is to strengthen the U.S. Government's ability to prevent the export of certain items to unauthorized destinations and/or end users because the AES aids in targeting, identifying, and when necessary confiscating suspicious or illegal shipments prior to exportation.

14.     EEI is official information submitted to DHS, Census, and other U.S. Government agencies in connection with exports from the United States.  Exporters, shippers, and freight forwarders are required to file EEI for every export of goods or technology from the United States with a value of US$2,500 or more, and for any export requiring a license regardless of value.

15.     An essential and material part of EEI and the AES, as well as other export filings, is information concerning the end user or ultimate destination of the export.  The identity of the end user or ultimate destination may determine whether the goods may be exported: (a) without

6

any specific authorization from the U.S. Government; (b) with the specific authorization or license from the U.S. Department of the Treasury, Office of Foreign Assets Control (OFAC), or the DOC, Bureau of Industry and Security (BIS). Alternatively, the end user's identity or ultimate destination may determine whether the goods may not be exported from the United States.

16.    EEI and other forms filed through the AES are used by CBP, U.S. Immigration and Customs Enforcement (ICE), Census, OFAC, and BIS. Other U.S. Government agencies also rely upon the information submitted to the U.S. Government via the AES.

17.    Prior to October 1, 2008, exporters were required to submit the same information in a paper document called a Shipper's Export Declaration (SED). The EEI filed in AES also was required, when applicable, to include the license authority for the export and the Export Control Classification Number (ECCN) assigned to the goods being exported pursuant to the EAR.

## B.    Factual Background

18.    Green Wave Telecommunication, Sdn Bhn (Green Wave), located in Kuala Lumpur, Malaysia, under the leadership and direction of Morteza Razavi, unlawfully acquires controlled technology for Iran-based companies who are otherwise unable to procure such technology directly from United States-based manufacturers and suppliers. According to records provided by the Government of Malaysia, Green Wave was formed on November 23, 2009; shares were allotted on May 20, 2011, and Green Wave was registered in Malaysia with the Companies Commission of Malaysia on June 1, 2011, by Razavi, Alireza Mofazzalifard Hassan, Faizura Binti Ramli, and Chan Che San.

19.     As described more fully below, this investigation has revealed that Green Wave is engaged in the business of acquiring export-controlled microelectronics and other high-tech communications devices on behalf of Iran-based Fanavari Moj Khavar (Fana Moj) and its subsidiary, Rastafann Ertebat Engineering Company (Rastafann), also located in Iran. Fana Moj designs and produces digital video broadcasting equipment and supplies microwave radio systems and wireless broadband access in Iran. Rastafann is a high-tech company also serving in the telecommunications and electronics systems industry.

20.     Beginning as early as 2010 and continuing through December 2012, Ghodskani, as an employee of Green Wave, negotiated the purchase of export-controlled technology, including digital communications devices and related equipment, from both Minnesota-based ███████████████████ and Massachusetts-based ███████████████ (together, the U.S. Companies). Once the terms of the transaction were agreed upon, Ghodskani submitted purchase orders to the U.S. Companies to obtain the controlled digital communications devices and related equipment. When engaging in these negotiations, Ghodskani communicated with the U.S. Companies by email and represented herself as an employee of Green Wave and located in Malaysia. However, email records obtained through legal process demonstrated that Ghodskani was, at all times relevant to this case, employed by Fana Moj and located in Tehran.

21.     Because converters, analog devices and synthesizers purchased by Green Wave are export-controlled, the U.S. Companies required Green Wave to certify that the items would be used in Malaysia and not shipped onward. In all cases, Ghodskani, or another employee of Green Wave, made this certification despite knowing that the items would be exported unlawfully to Iran.

22.     When the export-controlled items arrived in Malaysia, Alireza Jalali (Jalali), the manager of Green Wave's Purchasing Department in Kuala Lumpur, repackaged them and unlawfully exported the items from Malaysia to either Fana Moj or Rastafann in Iran. These exports were shipped from Malaysia to Iran using TNT Express Worldwide (M) Sdn. Bhd. (TNT), a Malaysia-based subsidiary of TNT Express, N.V. When accomplishing the export of these export-controlled items to Iran from Malaysia, Jalali fabricated invoices that vastly understated the true value of the exported items to Malaysian customs authorities.

23.     The converters were classified at the time of their shipment as Export Control Classification Number 3A001. After being exported from the United States to Malaysia, these items were then illegally shipped by Green Wave to Fana Moj, located in Tehran, without authorization from the United States in violation of U.S. law as set forth more fully below. Email correspondence; business records from ▮▮▮▮▮▮ and Green Wave; and TNT shipping records demonstrate the role played by both Ghodskani and Jalali in committing these offenses.

24.     To date, the investigation has revealed at least four unlawful exports of export-controlled technology from the United States to Iran via Green Wave in Malaysia. In all four instances, TNT shipping records showed that the controlled technology was sent to Green Wave in Malaysia, repackaged, and then shipped to Fana Moj in Tehran. As explained in fuller detail below, email correspondence obtained through legal process demonstrated Ghodskani's central role in facilitating these unlawful transactions:

a.     On February 22, 2011, TNT shipped 47 converters (item number AD9254BCPZ-150) purchased from ▮▮▮▮▮▮by Green Wave, to Fana Moj in Iran.

9

    b.    On March 3, 2011, TNT shipped 4 analog devices (item number AD9780BCPZ) purchased ▓▓▓▓▓▓ by Green Wave, to Fana Moj in Iran.

    c.    On August 25, 2011, TNT shipped 40 synthesizers (item number HMC698LP5E) purchased ▓▓▓▓▓▓ by Green Wave, to Fana Moj in Iran.

    d.    On August 29, 2011, TNT shipped 110 synthesizers (item number HMC698LP5E) purchased ▓▓▓▓▓▓ by Green Wave, to Fana Moj in Iran.

25.    Some of the evidence offered at trial to prove the government's case beyond a reasonable doubt will include email communications between Ghodskani and the U.S. Companies in which she advises the U.S. Companies that the country of ultimate destination is Malaysia, and in which she uses a signature block that depicts a phone number that indicates she is located at Green Wave in Malaysia. Below is a "screenshot" of such an email:

Page 3 of 4

**Sent:** Tuesday, January 4, 2011 02:25 AM
**To:**

'Customer Service';Customer Service2
**Subject:** PO

Dear Digi-Key,

Please find the attached file,
And send me your PI,
Kindly, note that we need these goods in Reel, except row#6.
Then if it has any extra charges, please add it in your PI.
Also , the shipment method is with UPS, and add the shipping charge in your PI as well,
Then, the below is the answer of questions you may ask,

What does your company do? (Manufacturer, Distributor, Contract Manufacturer, Repair, Design, Etc.) R&D
What is the application of the parts? DVBT-Exciter, (It is  Digital Video Broadcasting Transmitter and Exciter is use in  Digital broadcasting.
It is included some boards and these parts use in these boards.)

What is the specific application of the parts? Interface-SMD-/RS485 Transciver/ Synth-4GHz-SMD-/(2.7~5 5V).NOPb/ ADC-14Bit-150MSPS-
6MD-/1 8V.NOPb/
Res-68-5%-0603-/Array 2x4/ Interface-SMD-/SMPTE HOT Link Transiver/ Other/Coincel:-3V.Battery/ LIne Filter-LCL-2706-/1000pF.2A.60V,EMI

What is the ultimate destination of the parts? (Specific country or countries) Malaysia
Who is the end user of the parts? Green Wave Telecommunication

Thanks a lot,
Best Regards,

*Nezar Kani* (Ms.)
Commerce Department of Green wave
Telecommunication SDn. BHd.
Tel: +60-3-2282-5134
Fax:+60-3-2282-5135



26.     By contrast, in her email communications with co-defendant Jalali and others,

Ghodskani uses a signature block with a phone number indicating she is employed by Fana Moj

and located in Iran.  Below is one such email communication between Ghodskani and Jalali in

which Ghodskani forwards to Jalali a fact sheet about an analog-to-digital converter

manufactured by a U.S. Company later purchased by Green Wave and re-exported to Fana Moj

in Tehran:

Page 1 of 1

**From:** "Kani, Negar" <N.Kani@fanamoj.com>
**To:** <a.jalali@gwt.com.my>; "alireza jalali" <arezaj@gmail.com>
**Sent:** Monday, September 27, 2010 2:03 AM
**Attach:** AD9254.pdf
**Subject:** FW:

Usage: DVBT Exciter board,

*Negar Kani* (Ms.)
Commerce Department of FANAMOJ Group
www.fanamoj.com
Tel: +98 21 88 33 46 33      
Fax:+98 21 88 33 46 22

a.    When transmitting email communication to *non-U.S. companies* about acquiring

technology for Fana Moj, Ghodskani also uses her "Fana Moj" signature block and

abandons the unnecessary pretext that she works for a Malaysia-based company:

> **From:** Purchase [mailto:Purchase@fanamoj.com]
> **Sent:** Tuesday, September 20, 2011 2:48 PM
> **To:** 'Junior Zhu'
> **Subject:** RE: Dear Mr. Razavi from FANAMOJ
>
> Dear Junior,
>
> I hereby would like to confirm the receipt of below email with thanks,
> We appreciate your business and will do our best to have collaboration with your company,
>
> Thanks a lot,
> Best Regards,
>
> *Negar Kani* (Ms.)
> Commerce Department of FANAMOJ Group
> www.fanamoj.com
> Tel: +98 21 88 33 46 33
> Fax:+98 21 88 33 46 22

27.    In addition to email communications, at trial, the government will also introduce

evidence including international air waybills showing the exports of the converters, synthesizers

and analog devices from the United States to Green Wave in Malaysia; international air waybills

12

showing the shipment of the converters, synthesizers and analog devices from Green Wave in Malaysia to Fana Moj in Iran, including the dates they were shipped, the addresses in Iran they were shipped to, signatures of a Green Wave employee in Malaysia, a general description of the items, and quantities; international wire transfers from Green Wave to the U.S. Companies for the purchase of the converters, synthesizers and analog devices; Green Wave invoices to the U.S. companies for the sale of the converters, synthesizers and analog devices -- these invoices often depict defendant Ghodskani's name and Green Wave title and contact information; EEI filings via the AES which the U.S. Companies filed with the U.S. government in which they state the country of ultimate destination is Malaysia; invoices from the U.S. Companies to Green Wave indicating the country of ultimate destination is Malaysia; and invoices from Green Wave to Fana Moj indicating the country of ultimate destination is Iran.

28.    Further, the evidence that Ghodskani acted willfully, i.e. she knew what she was doing was illegal, includes the following:

a.    An email dated March 31, 2012, Ghodskani sent to her language instructor in which she wrote:

> "Hi My lovely teacher, about the question number 6: I'm proud of one and the best project which I have done at 2011, My company was import electronical parts from abroad, and because of sanction they couldn't purchase these kind of parts from other country, I offer them to open a virtual office in another country like Dubai which has relation with Iran, and purchase all parts from this virtual office, and then import to Iran, Thanks a lot, Best Regards, Negar"; and

b.    Ghodskani's use of an email signature indicating she was at Green Wave in Malaysia when dealing with U.S. Companies, and the use of an email signature indicating she worked at Fana Moj in Iran when dealing with Green Wave employees in Malaysia.

c.  In an email dated March 24, 2010, Ghodskani sent Jalali an invoice from ▇▇▇ ▇▇▇ for the purchase of export controlled electronics. The invoice contained the following diversion control language:

> "These commodities, technology or software were exported from the United States in accordance with the Export Administration regulations; Diversion contrary to U.S. law prohibited."

d.  In an email dated August 9, 2010, Ghodskani received from Jalali a packing slip and an invoice from ▇▇▇▇▇▇ for the purchase of several U.S. origin synthesizers. Both documents contained the following diversion control language:

> "For those commodities exported from the United States in accordance with the Export Administration Regulations, diversion contrary to U.S. law is prohibited. United States law prohibits disposition of these commodities to Iran, Iraq, N. Korea, Libya, Cuba, Syrian and Sudan."

e.  In an email dated August 31, 2011, Ghodskani communicated with a representative of ▇▇▇▇▇▇▇▇, a Hong Kong company that specializes in designing and manufacturing microwave components.  Ghodskani referenced that she would

> "arrange the payment from our sister company in Malaysia. You will receive this payment from Green Wave Telecommunication, the below is our DHL account, 'Fanavari Moj Khavar' Account Number 950682826."

### Part III
### The Charges and Pertinent United States Law

**A.   The Charging Process**

29.   Under the federal law of the United States, a criminal prosecution is commenced when a grand jury files an indictment. Institutionally, a grand jury, though an arm of the court, is an independent body composed of private citizens — not less than 16 and not more than 23

people — whom the United States District Court selects at random from the residents of the judicial district in which the court resides. The purpose of the grand jury is to review the evidence of crimes presented to it by United States law enforcement authorities. After independently reviewing this evidence, each member of the grand jury must determine whether there is probable cause to believe that a crime has been committed and that a particular person committed that crime. If at least 12 jurors find that the evidence they have reviewed provides probable cause to believe that a particular person committed the crime, the grand jury may return an indictment. An indictment is a formal written accusation that charges the particular person, now a defendant, with a crime, identifies the specific laws that the defendant is accused of violating, and specifies the date and place where the charged crime occurred.

30.     The grand jury initiates the criminal prosecution when it files the indictment with the United States District Court. Thereafter, the clerk of the court, at the direction of a United States District Judge or Magistrate Judge, normally issues a warrant for the defendant's arrest.

**B.      Procedural History of the Case**

31.     On December 8, 2015, a grand jury sitting in the District of Minnesota returned a sealed indictment charging Ghodskani, Green Wave, and Jalali with criminal offenses against the laws of the United States and filed the indictment with the United States District Court for the District of Minnesota. It is the practice of the United States District Court for the District of Minnesota to retain the original indictment and file it with the records of the court. Therefore, I have obtained a copy of the indictment, certified as true and accurate, from the clerk of the court and have attached it to this affidavit as **Exhibit 1.**

32.     On December 8, 2015, based on the indictment filed by the grand jury, and with the approval of the United States District Court for the District of Minnesota, █████████

███, the Deputy Clerk of the court, signed arrest warrants for the defendants, including Ghodskani. Pursuant to Rule 9 of the Federal Rules of Criminal Procedure, the clerk of the court is the authority competent to sign arrest warrants and deliver them for execution to law enforcement authorities competent to make arrests. A copy of Rule 9 is attached to this affidavit as **Exhibit 2**. It is the practice of the United States District Court for the District of Minnesota to retain the original arrest warrant and file it with the records of the court. Therefore, I have obtained a copy of the arrest warrant for Ghodskani, certified as true and accurate, from the clerk of the court and have attached it to this affidavit as **Exhibit 3**.

## C.  The Charges, Penalties, and Pertinent United States Law

33.      The indictment charges in 7 counts that defendants Ghodskani, Green Wave, and Jalali committed the following offenses:

| | |
|---|---|
| **Count 1:** | Conspiracy to Defraud the United States and to Commit Offense Against the United States, in violation of IEEPA, Title 50, United States Code (U.S.C.), Section 1705(c), the EAR, Title 15, Code of Federal Regulations (C.F.R.), Section 764.2, and the ITSR, 31 C.F.R. Sections 560.203 and 560.204, all in violation of 18 U.S.C. Section 371, carrying a maximum penalty of 5 years' imprisonment. |
| **Counts 2 and 3:** | Unlawful Smuggling of Goods out of the United States, and Attempted Unlawful Smuggling of Goods out of the United States, in violation of 18 U.S.C. Section 554 and 2, carrying a maximum penalty of 10 years' imprisonment. |
| **Counts 4 and 5:** | False Statements in violation of 18 U.S.C. Sections 1001 and 2, carrying a maximum penalty of 5 years' imprisonment. |
| **Counts 6 and 7:** | Money Laundering by transferring funds into the United States for the purpose of promoting illegal activity, in violation of 18 U.S.C. Sections 1956(a)(2)(A) and 2, carrying a maximum penalty of 20 years' imprisonment. |

34.    The United States requests the extradition of Ghodskani from Australia for all of these offenses. Each of these offenses is punishable under a statute regulation that (1) was the duly enacted law of the United States at the time the offense was committed, (2) was the duly enacted law of the United States at the time the indictment was filed, and (3) is currently in effect. Each offense is punishable under United States law by one year or more of imprisonment. I have attached a copy of the pertinent sections of these statutes and regulations, including the applicable penalty provisions, as **Exhibit 4.**

**Count 1**

35.    Count 1 charges Ghodskani with Conspiracy to Defraud the United States and to Commit Offenses Against the United States, in violation of IEEPA, 50 U.S.C. Section 1705(c), the EAR, 15 C.F.R. Section 764.2, and the ITSR, 31 C.F.R. Sections 560.203 and 560.204, all in violation of 18 U.S.C. Section 371.

36.    The crime of conspiracy is an independent offense, separate and distinct from the commission of any specific "substantive crime." Consequently, a conspirator can be found guilty of the crime of conspiracy to commit an offense even where the substantive crime that was the purpose of the conspiracy is not committed. The Congress of the United States has deemed it appropriate to make conspiracy, standing alone, a separate crime, even if the conspiracy is not successful, because collective criminal planning poses a greater threat to the public safety and welfare than individual conduct and increases the likelihood of success of a particular criminal venture.

37.    To satisfy its burden of proof and convict Ghodskani on Count 1, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements as to Count 1:

a. Two or more persons entered into an unlawful agreement to commit the underlying offenses (i.e., exporting items from the United States to Iran without a license or proper authorization from the United States Departments of Commerce and Treasury);

b. That Ghodskani knowingly became a member of the conspiracy;

c. That at least one co-conspirator committed at least one of the overt acts charged in the indictment; and

d. That the overt act was committed in furtherance of the conspiracy.

38.     The government at trial will prove Count 1 beyond a reasonable doubt based on evidence described above, including email communications where she conceals her true location when dealing with U.S. companies and her true location when dealing with non-U.S. companies, bank records documenting wire transfers, various invoices from Green Wave and U.S. companies.

**Counts 2 and 3**

39.     Counts 2 and 3 charge Ghodskani with smuggling items, particularly converters and analog devices, out of the United States, contrary to law or regulation, in violation of 18 U.S.C. Sections 554 and 2.

40.     To satisfy its burden of proof and convict Ghodskani on Counts 2 and 3, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements as to each count:

a. That Ghodskani fraudulently and knowingly received, concealed, bought, or sold merchandise, articles, and objects, or in any manner facilitated the transportation, concealment, or sale of such merchandise, articles, and objects, prior to exportation; and

b.  At that time, Ghodskani knew the merchandise, articles, and objects to be intended for exportation contrary to a law or regulation of the United States.

41.     The evidence the government will offer at trial for Counts 2 and 3 will be largely the same.  The government at trial will prove Counts 2 and 3 beyond a reasonable doubt based on largely the same evidence to show that the conduct alleged herein took place on the dates alleged.    The government's evidence will establish that Ghodskani negotiated the price, purchase, and timing of shipment of the converters and analog devices alleged in the indictment. Ghodskani falsely represented herself as an employee of Green Wave located in Malaysia and falsely represented to the U.S. Companies that the Green Wave was the end user of the converters and analog devices.  This caused the U.S. Companies to falsely file with the U.S. government statements indicating the country of ultimate destination is Malaysia.  Ghodskani then directed the U.S. Companies to ship the converters and analog devices to Green Wave in Malaysia and caused wire transfers to be sent to the U.S. Companies.

42.     The evidence that the government will offer at trial to prove Counts 2 and 3 will include the following to show that the conduct alleged herein took place on the dates alleged: various email communications between Ghodskani and other entities showing the discrepancy of her location, invoices to and from Green Wave and other documents seeming to show that the ultimate destination was Malaysia.

43.     Counts 2 and 3 also charge Ghodskani with Attempting to Smuggle the converters and analog devices out of the United States, contrary to law or regulation, in violation of 18 U.S.C. Sections 554 and 2.

44.     Under United States law, both a completed offense and an attempt to commit an offense can be charged in the same count.  Under United States law, in order to prove a

defendant guilty of an attempted crime, the United States must prove that the defendant specifically intended to commit the crime and had the required state of mind, and that the defendant took a substantial step towards committing the crime.

45. To satisfy its burden of proof and convict Ghodskani of attempting to smuggle items from the United States, as also charged in Counts 2 and 3, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements as to each count:

a. That Ghodskani intended to fraudulently and knowingly receive, conceal, buy, or sell merchandise, articles, and objects, or in any manner facilitate the transportation, concealment, or sale of such merchandise, articles, and objects, prior to exportation;

b. That Ghodskani knew the merchandise, articles, and objects were intended for exportation contrary to a law or regulation of the United States; and

c. Ghodskani took a substantial step toward actually completing one of the above actions.

46. For Counts 2 and 3, the evidence the government will offer at trial will establish that Ghodskani took a substantial step in attempting to smuggle the items out of the United States. The evidence offered to prove attempting to smuggle items from the United States as charged in Counts 2 and 3 will be the same as for the charged completed crime.

**Counts 4 and 5**

47. Counts 4 and 5 charge Ghodskani with making false statements in a matter within the jurisdiction of the United States, specifically the jurisdiction of the U.S. Customs and Border Protection, the U.S. Bureau of the Census, and the U.S. Department of Commerce's Bureau of Industry and Security, in violation of 18 U.S.C. Sections 1001 and 2.

48.     To satisfy its burden of proof and convict Ghodskani on Counts 4 and 5, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements as to each count:

        a.     That Ghodskani knowingly and willfully falsified, concealed, and covered up by trick, scheme, or device a material fact, or knowingly and willfully made material false, fictitious, or fraudulent statements or representations, or knowingly and intentionally made or used a false writing or document knowing it to contain materially false, fictitious, or fraudulent statements or entries, in violation of Title 18 U.S.C. Sections 1001 and 2; and

        b.     That Ghodskani took such action in a matter within the jurisdiction of the executive branch of the United States government.

49.     The government at trial will prove Counts 4 and 5 beyond a reasonable doubt based on the following evidence to show that Ghodskani caused the U.S. Companies from which she purchased the converters and analog devices to falsely submit statements to the U.S. government via the AES indicating that the ultimate destination of the items was Malaysia when she knew that the ultimate destination was Iran.

50.     The evidence offered to prove Counts 4 and 5 will include email communications with misleading information regarding Ghodskani's whereabouts, filings of the U.S. companies, invoices to and from Green Wave and international air waybills.

**Counts 6 and 7**

51.     Counts 6 and 7 charge Ghodskani with money laundering, specifically transferring funds into the United States for the purpose of promoting illegal activity, in violation of 18 U.S.C. Sections 1956(a)(2)(A) and 2.

52.    To satisfy its burden of proof and convict Ghodskani on Counts 6 and 7, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements as to each count:

a.  That Ghodskani transported money to a place in the United States from or through a place outside the United States; and

b.  That Ghodskani intended to promote the carrying on of a specified unlawful activity, namely, smuggling or exporting items without a license, in violation of IEEPA, the ITSR, and the EAR.

53.    The government at trial will prove Counts 6 and 7 beyond a reasonable doubt based on the following evidence to show that Ghodskani caused to be sent two different wire transfers to a bank account located in the United States, maintained in Minnesota, for the purchase and illegal export of the converters and analog devices, in violation of IEEPA, the EAR, and the ITSR.  Specifically, Ghodskani caused the following two wire transfers: $13,181.90 (from Malaysia), and $38,248.60 (from Malaysia), totaling $51,430.50.

54.    The evidence offered to show this at trial will include the bank records documenting those wire transfers, including the country of origin and the sender, as well as email communications between Ghodskani and the U.S. Companies regarding structure and timing of the payment for the purchase of the converters and analog devices, as well as timing and manner of shipment of those items to Malaysia.

**D.  Statute of Limitations**

55.    The statute of limitations applicable to the offenses charged in the indictment is 18 U.S.C. Section 3282(a), which allows prosecution to commence within five (5) years after an offense is committed.  I have attached a copy of this statute to this affidavit as **Exhibit 5**.  The

indictment is dated December 8, 2015, and charges offenses that occurred between August 2010 and March 2012. Therefore, the charges were filed within the prescribed time.

### E.   Status of the Case

56.   In early 2012, Ghodskani emigrated from Iran to Australia and began to work for ██████████████████████████, an oil and gas consulting company in Adelaide. U.S. law enforcement authorities have discovered that Ghodskani has a valid Iranian passport; as a result, U.S. law enforcement authorities are concerned that Ghodskani may attempt to flee Australia should she discover that there is an indictment pending against her and a warrant for her arrest. For this reason, U.S. law enforcement authorities have obtained a court order sealing the indictment and warrant until Ghodskani is arrested. Defendants Green Wave and Jalali remain charged under seal and it is the hope of the prosecution to be able to simultaneously execute arrests of Jalali and Ghodskani.

### Part IV
### Description of Fugitive

57.   In approximately 2012, investigators executed a criminal search warrant on an email account known to be used by Ghodskani, ██████████████████. In that search, investigators obtained a copy of Ghodskani's Iranian passport which included identification information for Ghodskani. Email search warrants that were conducted during the course of this investigation, including a search of ███████████████, revealed evidence that Ghodskani used three email accounts to conduct illegal transactions, including N.Kani@fanamoj.com and N.Kani@gwt.com.my, on behalf of Green Wave. Ghodskani is an Iranian citizen who is lawfully residing in Australia. She was born in Iran on ███████. She has dark hair and brown eyes. Her last known work address is ████████████████████████

Thebarton, SA 5031, Australia; her last known home address is ███████████, Eastwood SA 5063 (current as of 2012). Phone: ████████(mobile) and ████████(work). I have attached a photograph of Ghodskani to this affidavit as **Exhibit 6**. This passport photograph was obtained during the search of Ghodskani's email account. The email in which this photograph was recovered was sent by Negar Ghodskani to ████████, an individual believed to be Ghodskani's husband. The email was sent on November 19, 2011, and the subject of the email was "Documents." The email contained a copy of Ghodskani's passport, as well as a copy of ████'s passport.

## Part V

### Index to Exhibits and Certification

58.     I have attached the following documents and exhibits in support of this request for the extradition of Negar Ghodskani:

A.  Exhibit 1 is a certified copy of the indictment;

B.  Exhibit 2 is a copy of Rule 9, Federal Rules of Criminal Procedure;

C.  Exhibit 3 is a certified copy of the arrest warrant;

D.  Exhibit 4 is a copy of the pertinent sections of the following statutes

and regulations:

- Title 18, United States Code, Section 2
- Title 18, United States Code, Section 371
- Title 18, United States Code, Section 554
- Title 18, United States Code, Section 1001
- Title 18, United States Code, Section 1956
- Title 50, United States Code, Section 1705
- Title 15, Code of Federal Regulations, Section 764.2
- Title 30, Code of Federal Regulations, Sections 560.203, and 560.204

E.  Exhibit 5 is a copy of Title 18, United States Code, Section 3282(a).

F. Exhibit 6 is one photograph of Negar Ghodskani.

## Conclusion

59.     I have thoroughly reviewed the prosecution's evidence against Negar Ghodskani and attest that this evidence is sufficient to establish that she is guilty of the offenses charged in the indictment beyond a reasonable doubt.

FURTHER YOUR AFFIANT SAYETH NOT.

Executed on May _18_, 2016, at Minneapolis, Minnesota, United States of America.

ANDREW M. LUGER
United States Attorney

BY:  CHARLES J. KOVATS, JR.
Assistant U.S. Attorney
United States Attorney's Office
600 United States Courthouse
300 South Fourth Street
Minneapolis, MN 55415

Signed and sworn to before
me this _18th_ day of May, 2016.

THE HONORABLE FRANKLIN L. NOEL
UNITED STATES MAGISTRATE JUDGE