UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-329 (JNE/KMM)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | DEFENDANT'S POSITION ON |
| ) | SENTENCING FACTORS |
| NEGAR GHODSKANI, ) | |
| ) | |
| Defendant. ) | |

When Negar Ghodskani was hired by Fana Moj, an Iranian telecommunications manufacturer, more than ten years ago, she never imagined that her work would lead to her arrest in Australia, giving birth while in jail, extradition to the United States, and incarceration for over two years. She was little more than a procurement manager, sourcing electronic components needed by her employer for the broadcasting equipment it manufactured. She had no technical background and had no idea what the components she purchased were used for. Her primary job qualification was that she spoke English, making her adept at communicating with U.S. companies.

Ms. Ghodskani knew that the work she did required that she evade U.S. export controls. That was a fact of life of her employment and of the entire Iranian economy, which is based on sophisticated systems to overcome trade restrictions. Now, eight years after she left the company, her work at Fana Moj continues to haunt her. As a result of this conviction, she has lost everything she worked for in Australia.

The guidelines in this case overstate Ms. Ghodskani's criminal culpability, fail to consider the harsh collateral consequences of her conviction, and cause unwarranted sentencing disparity. She has already been in custody since June 16, 2017. With good time, that is the equivalent of a sentence of 31 months. We respectfully ask the Court to impose a sentence of time served, so that she can be deported back to her family in Iran.

## FACTS

Negar Ghodskani is forty years old. She was born and raised in Iran. Her father worked as a civil engineer in Iran. She has one sibling, a brother who works on a farm that grows special roses for rose water. After completing high school, Ms. Ghodskani attended Azad University in Tehran. She graduated with a B.A. degree in theoretical economy in 2001. From 2004 to 2006, she attended Symbiosis University in Pune, India, where she received an MBA. She wrote her dissertation on marketing management.

While she was in India, Ms. Ghodskani met Ali Lotfisetan, an Iranian man who lived next door. Like Ms. Ghodskani, Mr. Lotfisetan was studying in India. He was working toward a masters degree in psychology. In 2009, they got married. Together they have a son, Nickan who was born in November 2017, while she was in jail for this case. Ali worked as a sports journalist in Iran.

Following her graduation, Ms. Ghodskani returned to Iran. She obtained employment doing market research for a dairy company. Her job was very far from her house. It took her two hours to get to her office, so she was interested in new

2

employment. In 2008, her manager at the dairy left the company and took a job as the Human Resources Director for Fanavari Moj Khavar ("Fana Moj"), an Iranian manufacturer. He asked Ms. Ghodskani to apply for a job with the company. She agreed to do so and interviewed for a position. Around the same time, she applied for a different job, this one with a stone company that made flooring tile. She was indifferent as to which job she preferred. She decided she would take whichever job was offered to her first.

As it turned out, both companies offered her jobs on the same day. She accepted a job with Fana Moj because it was a significant manufacturer in Iran. Fana Moj designs and produces digital video broadcasting equipment and telecommunications equipment for mobile phones. The Islamic Republic Iran Broadcasting Company, Iran's government-run television network was a major customer of Fana Moj. The directors of the company are well-educated scientists with doctorates from the top universities in the country. The head of the company was also an academic. He taught courses at a university and held numerous patents. These men were the best and the brightest in their field. Ms. Ghodskani was excited to work for this impressive company.

Ms. Ghodskani began work at Fana Moj in 2008. She was assigned to the international commerce department because she spoke English. Her job was to purchase electronics parts for the company's products. Ms. Ghodskani does not have an electronics background. She did not know what the parts were or what they were used for. She simply was given part numbers which she would look up online. She

would find the best price for the parts, which she would relay to her supervisors. If they approved the price, she would complete the purchase. If sellers asked for more information about the end use for the components, she would relay this information from her supervisors.

The economic sanctions against Iran made it difficult to source the products that Fana Moj needed. The company could not buy directly from U.S. companies because they could not do business with Iran. As a result, Ms. Ghodskani had to purchase U.S. origin parts through multiple foreign intermediary purchasers, which raised the prices substantially. At times they purchased knock off parts that were lower quality than U.S.-made parts. Or, they were sent low quality counterfeit parts that had been sold as if they were authentic. These parts were more likely to fail, thereby damaging Fana Moj's reputation.

In 2009, Ms. Ghodskani's supervisor told her that Fana Moj had decided to open a front company in another country that could do business directly with U.S. companies. As a result, Fana Moj established Green Wave Telecommunications in Malaysia. Green Wave began to procure U.S. products for Fana Moj. Ms. Ghodskani represented herself as a Green Wave employee when she communicated with U.S. companies. She falsely represented that Green Wave was the end user for the U.S.-made parts, even though she knew they would be illegally redirected to Fana Moj in Iran. Green Wave allowed Fana Moj to purchase products directly from U.S. companies, which would not have agreed to do business with Iran. In addition, Fana Moj hoped that Green Wave would be able to sell the products that Fana Moj

produced outside Iran, but that never happened.

Green Wave was operated by Alireza Jalali in Malaysia. Mr. Jalali was living in Malaysia while he was studying for his doctorate there. Mr. Jalali is a personal friend of Ms. Ghodskani. When Ms. Ghodskani lived in India, her roommate was Mr. Jalali's wife. Ms. Ghodskani knew that Mr. Jalali could be trusted with Fana Moj's money and knew that he needed a job, so she recruited him to run Green Wave.

While Ms. Ghodskani was still working for the dairy, before she was hired by Fana Moj, she had applied for a skilled worker visa to move with her husband to Australia. At the end of 2011, the visa was approved. Ms. Ghodskani was the principal visa holder based on her MBA and her work at the dairy doing market research analysis. As soon as her visa was approved, she quit her job with Fana Moj, and she and her husband moved to Australia in early 2012.

Even after she left the company, Fana Moj continued to procure U.S.-made parts through Green Wave. Jalali continued to operate Green Wave for Fana Moj until his arrest in 2017. Doc. No. 68 at 6. Ms. Ghodskani worked for Fana Moj for roughly three years, from 2008 to 2011, and she was part of the Green Wave scheme for less than two years.

Ms. Ghodskani and her husband lived in Australia from 2012 until this year. They left Iran because they wanted to live in a free society. Ms. Ghodskani and her husband did everything they could to support themselves. As recent immigrants, they had trouble finding work that was appropriate to their skill sets, but they

worked hard at any job they could find. Ms. Ghodskani worked at McDonalds and for a carpet cleaning business. She did data analysis for a geology company. She did customer service for a restaurant. In 2016, she and her husband took all of their savings and purchased a house cleaning franchise. Ms. Ghodskani managed the business, building clients, scheduling appointments, and hiring cleaners. She also cleaned houses herself and became a trusted contractor to her clients.

Meanwhile, her husband Ali, completed a certification course in aged care and began to work as a caretaker for the War Veteran's Residential Aged Care Home.

After 5 years of hard work, Negar and Ali had become established in their community of Adelaide, Australia. They had a circle of friends. They had good jobs, and they were supporting themselves. They were contributing to their community. They were happy. That all came to an explosive end on June 16, 2017, when the Australian Federal Police arrived at Ms. Ghodskani's modest home and placed her under arrest as a result of an extradition warrant issued on behalf of the United States. She has been in continuous custody ever since.

At the time of her arrest, Ms. Ghodskani was pregnant. On November 24, 2017, her son Nickan was born while she was in custody. She was permitted to spend three days in the hospital with her son. After three days, the guards handed Nickan to her husband, and she was returned to jail. Ali describes the scene as follows:

> She brought the baby out of the room with the officers around her and they said time to go. She gave him to me, she wasn't crying but I can

6

> not explain about the sound she has made at that time. It was so sad. Everybody like the nurses and cleaners were crying except officers.

Letter from Ali Lotfisetan at 3 (included in Ex. 2, attached hereto.) In two months, Nickan will be two. His mother has been in jail his entire life.

Ms. Ghodskani has no criminal record in any country. This is her first offense.

## ARGUMENT

The guideline applicable to a violation of U.S. export controls is U.S.S.G. § 2M5.1. That guideline calls for a base offense level of 26. There are no specific offense characteristics and no applicable enhancements under chapter 3 of the guidelines. With a 3-level reduction for acceptance of responsibility, this results in a total offense level of 23. Ms. Ghodskani is in criminal history category I, resulting in a guideline range of 46-57 months in prison.

This guideline range overstates Ms. Ghodskani's culpability, fails to consider the severe collateral consequences she has suffered as a result of this offense, and creates unwarranted sentencing disparity. The guidelines far exceed a sentence that "is sufficient but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a). For these reasons, the defense asks the Court to impose a sentence of time served.

I.   The Guideline Range Overstates Ms. Ghodskani's Culpability

Ms. Ghodskani's offense level is 26 rather than 14 because Iran is a country that supports international terrorism. Otherwise, her guideline range, after acceptance of responsibility, would be 10-16 months.

7

Although the fact that Iran was the recipient of the items being purchased by Green Wave makes this offense a serious one, there are several mitigating factors that support a downward variance.

First, Ms. Ghodskani was living in Iran at the time of this offense, with no connection to the United States. Although she was aware of the economic sanctions imposed against Iran, from the perspective of an Iranian in Iran, those sanctions were simply obstacles to be overcome. Iran's entire economy depends on its ability to skirt trade sanctions. American products are very popular in Iran and are widely available. Levi jeans, Nike sneakers, Apple phones, and many other American brands are readily available in Iran, yet none can be purchased directly from U.S. companies. In the context of someone living and working in Iran, U.S. restrictions were remote at best.

Consider, for example, if Germany had a law that prevented foreign purchasers of its products from reselling them. An American living in the United States who owned a BMW would be unlikely to view this German law as having the same direct effect on him as he would a U.S. law. He might well be willing to violate the German law and resell his car, even though he would never knowingly violate a U.S. law.

Similarly, Ms. Ghodskani committed her crime in a culture where the violation of U.S. export controls was simply a way of doing business. When she began her job with Fana Moj, she did not see that company as a criminal enterprise. She saw it as a reputable company that was simply taking the steps necessary to

get the parts it needed for its manufacturing processes.

Second, Ms. Ghodskani was simply an employee of Fana Moj. She was only doing her job. While this in no way excuses her criminal conduct, for which Ms. Ghodskani takes full responsibility, the fact remains that she did not have decision making authority. She did not decide what parts to purchase. She did not decide to create a front company in a foreign country to disguise that Fana Moj was the end user for the products she was purchasing. Her job required that she maintain this pretense. She had no financial interest in the transactions. She simply received a modest salary for her work for Fana Moj.

Third, none of the products she purchased were arms, munitions, or weaponry. As far as she knew, all of the products she procured were for broadcast and telecommunications transmission equipment for civil uses. She worked for a private company. And, the parts charged in the indictment have civil applications in radio receivers, mobile telephones, and ultrasound devices. *See* Doc. No. 1 at 16. The ambiguous nature of the component parts charged in the indictment is reflected by the fact that, as determined by the Magistrate's Court of South Australia, export of the analog devices charged in Counts 3 and 5 of the Indictment, from Australia to Iran would not be a crime in Australia. For that reason, the Australian Court denied extradition on those two counts.

Fourth, Ms. Ghodskani was only employed for Fana Moj for three years. Her involvement with Green Wave continued for two years or less. By contrast, her codefendant Jalali, spent eight years facilitating the reshipment of U.S. goods from

Green Wave to Fana Moj.

Fifth, Ms. Ghodskani left Fana Moj in 2011, eight years ago. In the years since then, she and her husband created a new life in Australia.

For all of these reasons, Ms. Ghodskani is less culpable than the typical offender who violates U.S. export controls concerning Iran.

II.   Ms. Ghodskani Has Already Suffered Severe Collateral Consequences

Ms. Ghodskani has been in custody for over two years. With good time, she has already served the equivalent of a 31 month sentence.

But in addition to her incarceration, she has faced severe, life-altering collateral consequences as a result of this case. First, her conviction has made her ineligible for permanent residence in Australia. When she completes her sentence in the United States, she will not be permitted to return to Australia. She will be deported back to Iran, the country from which she emigrated in search of freedom and greater opportunity.

Worse, because her husband's visa depended on Ms. Ghodskani's skilled worker visa, he also has lost his immigration status as a result of his wife's conviction. After seven years living and working in Australia, and leading a blameless life, the entire family has no choice but to return to Iran. Mr. Lotifisetan has already wrapped up his affairs in Australia and has returned to Iran, where he is waiting to be reunited with his wife after two long years.

In addition, as noted previously, Ms. Ghodskani was arrested while she was pregnant. She suffered the ignominy of having to give birth in custody. After three

days, her newborn son was handed off to her husband and she was returned to jail. In nearly two years, she has never been there for her son to nurse him, to comfort him when he wakes up at night, or to see him take his first steps. She has had to make do with short jail visits in Australia and now that she is in the United States, video chats. She does the best she can, but she can see that her son no longer knows who she is. Meanwhile, her husband tries the best he can to raise his son as a single father.

Every aspect of Ms. Ghodskani's life has been turned upside down as a result of this case that dates back to 2011. She has lost her job and her cleaning franchise. She has lost her adopted country and will be forced to return to the repressive regime in Iran. And her own son does not know who she is.

In addition, if this Court sentences Ms. Ghodskani to additional imprisonment, she will face harsher conditions than similarly situated Americans. Her immigration status will prevent her from serving her sentence in a prison camp, although as a first offender, she would be otherwise eligible. Because she will have an ICE detainer on her during her sentence, she will be ineligible for a camp. In addition, she will be ineligible to spend the last months of her sentence in a halfway house. As a result, Ms. Ghodskani will serve her sentence under conditions that are substantially harsher than what she would face if she were an American citizen. The sentencing guidelines fail to contemplate this difference in setting the sentencing range.

The collateral consequences of a conviction, nowhere considered by the

guidelines, are themselves a proper basis for a downward variance. *See, e.g., United States v. Anderson,* 533 F.3d 623, 633 (8th Cir. 2008) (affirming variance based in part on fact that "defendant had suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Pauley,* 511 F.3d 468, 474 (4th Cir. 2007) (lower sentence warranted because defendant lost his teaching certificate and state pension, facts relevant to need for just punishment under § 3553(a)(2)(A) and adequate deterrence, § 3553(a)(2)(B)). As several courts have recognized, collateral consequences of conviction are relevant to the need for the sentence imposed to reflect just punishment and to deter future misconduct. *See, e.g., United States v. RV*, 157 F. Supp. 3d 207, 257 (E.D.N.Y. 2016) (noting "exacting collateral consequences which serve to deter future criminal conduct"); *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (affirming downward variance based in part on "lasting effects of being required to register as a sex offender"); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (consideration of collateral consequences consistent with 3553(a) directive that sentence reflect "need for just punishment," § 3553(a)(2)(A), and "adequate deterrence," § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008).

Negar understands she is completely responsible for all of the negative consequences that have befallen her. Still, this Court should consider the full range of consequences she has already suffered in determining an appropriate punishment.

III.     A Guideline Sentence Will Cause Unwarranted Sentencing Disparity

On March 20, 2018, this Court sentenced Alireza Jalali to 15 months in prison. Doc. No. 77. Mr. Jalali was Ms. Ghodskani's codefendant. As noted above, he operated Green Wave on behalf of Fana Moj from 2009 to 2017. Like Ms. Ghodskani, he pleaded guilty to Count 1 of the Indictment. Although his guideline range was slightly lower than Ms. Ghodskani's, because he was deemed to have had a minor role in the offense, he took part in the offense for eight years, in contrast to Ms. Ghodskani who worked with Green Wave for less than two years. Even contemplating that Ms. Ghodskani had a more important role than Mr. Jalali, that is more than contemplated by a time served sentence, which is the equivalent of a 31 month sentence, more than double the sentence Mr. Jalali received.

Moreover, Mr. Jalali's sentence was in keeping with other comparable cases. To assist the Court in assessing this factor, counsel attaches a spreadsheet with data on other cases with offense conduct involving a violation of, or a conspiracy to violate, U.S. sanctions laws and the International Emergency Economic Powers Act ("IEEPA"). *See* Ex. 1, attached hereto. This data was previously submitted to the Court on behalf of Mr. Jalali.

In the cases cited, the content of the prohibited shipments and their application and use, the number and value of transactions, and the characteristics of the defendant vary. Many of these cases involved military items, goods with application in nuclear projects, and/or goods worth millions of dollars.

Even so, in nine of the nineteen cases cited the defendants received sentences of probation. Of the remaining ten defendants, five received a sentence of one year or less. The remaining five cases involved either military equipment and parts (e.g., marine navigation) or a large number of transactions with the value of exported goods exceeding $1 million. None of the defendants in these cases received sentences as long as Ms. Ghodskani has already been in custody.

Although all of these cases support a time served sentence, we highlight a few:

In *United States v. Andre Telemi*, No. 1:09-CR-00736 (N.D. Ill. November 30, 2012), the defendant, a naturalized United States citizen, was sentenced to 5 years' probation after pleading guilty to a single count of a § 371 conspiracy to violate IEEPA. Mr. Telemi was convicted as part of a conspiracy to export 10 connector adapters used in TOW and TOW2 anti-armor missile systems from the United States to Iran. Mr. Telemi had significant involvement in the conspiracy, including frequently communicating with undercover agents regarding the purchase and export of the connector adaptors, negotiation of the sales price, finalizing payment for the connector adaptors, taking possession of the connector adaptors, and being responsible for their export from the United States without a license.

Unlike this case, in *Telemi*, the items involved in the offense were strictly for military applications, and the defendant was a U.S. citizen and business owner with a more direct connection to U.S. law. The government argued for a sentence

of 30 months, based on Mr. Telemi's attempts to deny criminal intent, despite numerous communications evidencing his knowledge and intent regarding the transaction.

In *United States v. Massoud Habibion*, No. 1:11-CR-00118 (D.D.C., May 16, 2012), the defendant was sentenced to 13 months under a single count of a § 371 conspiracy to violate IEEPA. The defendant conspired with several other individuals over the course of three years and shipped millions of dollars (at a rate of over $700,000 per month) of computer-related goods to Dubai for re-export to end users exclusively in Iran. Evidence in the case showed the defendant's critical role in the conspiracy and his knowledge of U.S. export laws. Further, Mr. Habibion was a U.S. citizen, operated his business in the U.S., and made frequent trips to Iran to meet with his customers. Despite all of these factors, Mr. Habibion received a sentence of 13 months, less than half the time Ms. Ghodskani has been in custody.

In *United States v. Saeed Talebi*, No. 1:12-CR-00295 (S.D.N.Y., February 19, 2013), the defendant was sentenced to a year and a day for attempting to obtain hundreds of thousands of dollars' worth of sensitive electrical components and industrial hardware as an agent for several petrochemical companies in Iran, including a company wholly owned by the Government of Iran. The petrochemical industry is among the primary sources of revenue for the Government of Iran.

IV.  The 3553(a) Factors Support a Time Served Sentence

Balanced against the seriousness of the offense, Ms. Ghodskani's personal history and circumstances support a sentence of time served. In many ways, Ms.

Ghodskani is a victim of fate. Had she received a job offer from the stone company a day earlier, she would not be here today. She did not set out to violate U.S. law. She simply did her job, fully aware that she was helping her employer to violate export controls, but understanding that that is how business is done in Iran. She holds no animosity toward the United States. Indeed, like most Iranian citizens, she holds the United States in high regard.

With the exception of this crime, Ms. Ghodskani's personal background has been exemplary. She has never been involved in any criminal conduct either before or after this crime. She has fully admitted her offense conduct, accepted responsibility, and expressed sincere remorse. As demonstrated by the letters of support submitted to the Court, Ms. Ghodskani is a good person who has led an otherwise unblemished life, is greatly respected by those in her life, and cares deeply about others.

The man who knows her best, her husband continues to support her. He describes his wife as follows:

> Its almost 12 years I know my wife and nearly 9 years we got married, she is dearest person in my whole life. Negar is one of the kindest and trustworthy people I have ever met. She has been always responsible and caring. She loves everybody and try to help anyone who ask for that. She is everything for me and my little son. I don't know how can I explain our feeling without her. She always worked hard and she was very kind and lovely wife to me and always try to managed our simple life.

Dr. Hooman Asadzadeh-fard, an Australian citizen, medical doctor, and family friend, describes Ms. Ghodskani as "one of the most honest, trustworthy and reliable people I have known in Australia. She was a decent

law-abiding member of our society, being a hard-working person, always ready to help everyone with no expectations with a beautiful, kind heart."

Another family friend, John Dennis conveys a similar sentiment, describing her as "a responsible citizen and law abiding. She is a kind and caring person and I have found her very trustworthy."

Drs. Yi-An and Yoke Mei Neoh have known Ms. Ghodskani since 2015 and were among her house cleaning clients. They describe Ms. Ghodskani as "friendly, thoughtful, honest and industrious." She is "someone of good character, personable, thoughtful and friendly."

Finally, Rosemary Joan Agnew worked with Negar while they were both employed for an oil and gas exploration company. "Her sense of humor," Ms. Agnew states, "was a bright spark in the office, helping the hours pass quickly." Later, when Negar started her cleaning service, Ms. Agnew hired her to clean the company offices. Negar, she said, "was a valued person of high moral standards."

## CONCLUSION

Ms. Ghodskani has proven herself to be an intelligent, industrious, trustworthy person. With the exception of this offense, which ended in 2011, her life has been blameless, indeed exemplary. She has already been in custody for 27 months, the equivalent of a 31 month sentence. Moreover, she has already paid a terrible price for her offense, her entire life having been upended. She has lost her job, her business, and her home in Australia. Now, she wants only to return to Iran

so that she can finally be reunited with her husband and young son.

For the foregoing reasons, this Court should impose a sentence of 27 months, the time already served in custody in Australia and the United States. That time has not been credited against any other sentence and so, is properly credited against her sentence in this case. *See* 18 U.S.C. § 3585(b). Ms. Ghodskani will be deported to Iran as soon as she completes her prison sentence, so no term of supervised release is required

Dated: September 18, 2019

                Respectfully submitted,

                *s/ Robert D. Richman*
                ROBERT D. RICHMAN
                Attorney ID No. 226142
                P.O. Box 16643
                St. Louis Park, MN 55416
                (651) 278-4987

                Attorney for Defendant