UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-329 (JNE)

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>    )<br>    Plaintiff, )<br>    )<br>v.   )<br>    )<br>NEGAR GHODSKANI, )<br>    )<br>    Defendant. ) | GOVERNMENT'S POSITION<br>WITH RESPECT TO SENTENCING |

The United States of America, by and through its attorneys Erica H. MacDonald, United States Attorney for the District of Minnesota, Assistant United States Attorney Charles J. Kovats, Jr., and United States Department of Justice Trial Attorney David C. Recker, hereby submits its position with respect to the sentencing of defendant Negar Ghodskani (hereafter "Ms. Ghodskani" or "the defendant").

## I.    THE CASE AGAINST THE DEFENDANT

### A.    The Charge of Conviction

On August 9, 2019, the defendant, Ms. Negar Ghodskani, pleaded guilty to conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. This offense carries a statutory maximum sentence of five years' imprisonment, a three-year term of supervised release, a $250,000 fine, and a $100 special assessment.

**B.     The Defendant's Offense and Relevant Conduct**

*1.     The Factual Basis in the Plea Agreement*

As agreed to by the parties in the plea agreement:

<u>Background on Green Wave Telecommunication</u>

Since its incorporation in 2009, defendant Green Wave Telecommunication, Sdn Bhn, ("Green Wave"), a Malaysian company located in Kuala Lumpur, Malaysia operated as a front company for Fanavar Moj Khavar ("Fana Moj"), an Iranian company located in Tehran, Iran.  Members of the conspiracy, including co-conspirator M.R., co-defendant Alireza Jalali ("Jalali"), and others, with some assistance from the defendant, established and operated Green Wave to engage in foreign commerce from Malaysia that would not be possible from Iran because such commerce would violate international sanctions and United States law.  The defendant's role in setting up Green Wave came both at the direction of co-conspirator M.R. and other high-level executives at Fana Moj.

<u>Background on Fana Moj</u>

Fana Moj specializes in both broadcast communications and microwave communications.  It also designs and produces digital video broadcasting equipment and supplies microwave radio systems and wireless broadband access in Iran.  During the scope of her employment at Fana Moj, the defendant understood that Fana Moj's principal customer was the Islamic Republic of Iran Broadcasting ("IRIB").  The IRIB was and is owned by the Government of Iran and operates the main television and radio broadcasting networks in Iran.

2

Defendant Ghodskani was a Tehran-based employee of Fana Moj from 2008 until in or about late 2011. During the period of her employment, defendant Ghodskani was a member of the Commerce Department at Fana Moj. As described in detail below, beginning as early as August 2010 and continuing through 2011 (when she left her employment at Fana Moj), defendant Ghodskani falsely represented herself as an employee of Green Wave to U.S. Companies in order to acquire unlawfully sensitive export-controlled technology from the United States on behalf of Fana Moj.

M.R. was nominally the director of Green Wave but officially a Tehran-based employee of Fana Moj during the pendency of the conspiracy. M.R. also was a member of the Commerce Department at Fana Moj and the supervisor/superior of both defendants Ghodskani and Jalali.

## The Object of the Conspiracy

During the course of the conspiracy of which defendant Ghodskani was a member, defendant Green Wave was used by the defendant, co-defendant Jalali, co-conspirator M.R., and others, to acquire unlawfully sensitive export-controlled technology from the United States on behalf of Fana Moj. In order to accomplish the acquisition, the members of the conspiracy would conceal the ultimate unlawful destination of the exported technology (Iran) through false statements, unlawful financial transactions, and other means. When defendant did so, it was based on the specific directions and instructions of co-conspirator M.R. and other employees of Fana Moj.

Relevant Actions of the Defendant

During the course of the conspiracy, Ghodskani would participate in foreign commerce to acquire technology, typically microelectronics, on behalf of Fana Moj. Specifically, Ghodskani would contact producers of the sought-after technology, solicit an agreement to purchase, and negotiate the purchase and delivery of these items with the selling company. When engaged in these transactions with U.S. companies, defendant Ghodskani would represent herself as an employee of Malaysia-based Green Wave. To defendant's knowledge, in nearly all cases, the purchased goods would be delivered to Green Wave's office in Malaysia but then re-shipped to Iran.

In order to accomplish the purchase of goods, defendant Jalali, at the direction of both M.R. and Ghodskani, would facilitate the receipt of funds from co-conspirator M.R. and Fana Moj, through a money exchanger, to the bank account of Green Wave held at a Malaysia-based bank. Green Wave would then wire funds from that bank to the selling company. Defendants Jalali, Ghodskani, and M.R. all understood that this payment system was required because Iran-based Fana Moj, due to economic sanctions imposed by the United States and other countries, could not conduct lawfully the financial transactions required to purchase these goods directly.

When the export-controlled technology was received by Green Wave in Malaysia, Jalali repackaged and unlawfully exported the items from Malaysia to Fana Moj in Tehran, Iran.

Defendants Jalali and Ghodskani, co-conspirator M.R., and others knew that virtually all of the items that Green Wave purchased and reshipped to Iran were ordered by co-conspirator M.R. or co-defendant Ghodskani on behalf of Fana Moj and ultimately paid with funds provided by Fana Moj. Further, Jalali, Ghodskani, and M.R. were aware of the inability of Iranian companies such as Fana Moj in Iran to conduct business transactions in U.S. dollars. They also were aware that Fana Moj needed to pay for the items it directed Green Wave to purchase using money exchangers located, in among other locations, the United Arab Emirates, in violation of U.S. law.

The investigation revealed several unlawful exports of export-controlled technology from the U.S. Companies to Iran via Green Wave in Malaysia. Shipping records show that the controlled technology was sent to Green Wave in Malaysia, repackaged, and then shipped to an Iranian company in Tehran. These shipments include the following:

    a.    On February 22, 2011, TNT shipped 47 converters (item number AD9254BCPZ-150) purchased from Minnesota-based U.S. Company 1 by Green Wave, to Fana Moj in Iran.

    b.    On August 25, 2011, TNT shipped 40 synthesizers (item number HMC698LP5E) purchased from Massachusetts-based U.S. Company 2 by Green Wave, to Fana Moj in Iran.

    c.    On August 29, 2011, TNT shipped 110 synthesizers (item number HMC698LP5E) purchased from Massachusetts-based U.S. Company 2 by Green Wave, to Fana Moj in Iran.

## 2. *Additional Facts Regarding the Offense Conduct*

In addition to the facts contained in the plea agreement, the Court should also consider the important national interest implicated by this prosecution. The United States, among many other countries, have imposed sanctions against Iran based on that country's continued support of international terrorism, as well as its development of a nuclear program. (PSR ¶ 8). Pursuant to the Department of Treasury's Iranian Transactions and Sanctions Regulations ("ITSR"), "no goods, technology or services may be exported, re-exported, sold, or supplied to Iran, directly or indirectly from the United States . . . without authorization." (*Id*). Here, the items purchased by the defendant were shipped to Iran to be used by entities that have been listed on the Department of the Treasury Specially Designated Nations List. (PSR ¶ 10).

## 3. *The Pertinent Guideline Calculations Agreed to by the Parties*

In the plea agreement, the parties agreed to the following Guideline calculations:

Base Offense Level, § 2M5.1(a)(1):           26      (Plea Agreement, para. 6(a))

Acceptance of Responsibility, § 3E1.1(a):    -3      (*Id*. para. 6(c))

The parties also agreed that the defendant's criminal history category would likely be I. (*Id*. para. 6(c)). Accordingly, the parties concluded that the defendant's Sentencing Guidelines range would be 46-57 months' imprisonment. (*Id*. para. 6(d)).

6

## II. THE PSR's CALCULATIONS AND RECOMMENDATIONS.

On or about September 9, 2019, the United States Probation Office disclosed the PSR in this case. The PSR calculates the defendant's applicable guideline range at 46-57 months' imprisonment, based on a total offense level of 23, criminal history category I, and a statutory maximum sentence of 5 years' imprisonment. (PSR ¶ 57). The PSR also sets forth the statutory maximum periods of supervised release (3 years) and probation (5 years). (PSR ¶¶ 60, 62). The PSR's calculations are aligned with those agreed to by the parties.

The government has no objections to the PSR and agrees with the factual summary contained therein. The government does not anticipate a need for an evidentiary hearing at sentencing.

## III. THE GOVERNMENT'S ANALYSIS UNDER 18 U.S.C. § 3553(a).

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence. The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." *Id.* at 50. If the court determines that a sentence outside of the Guidelines is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.*

### A.     Nature and Circumstances of the Offense.

The Executive Branch has determined, as a matter of foreign policy and national security, that the threat posed by the government of Iran is so severe that only sanctions and a trade embargo on certain U.S.-origin goods, technology, and services are adequate to protect the interests of the United States. That determination is within the sound judgment of the Executive Branch.

The defendant's enduring role in accomplishing the export of tens of thousands of dollars of U.S.-origin goods to Iran undermined U.S. sanctions against Iran and the Executive Branch's repeated declarations that the actions of the government of Iran is a threat to national security. The Sentencing Commission has highlighted the seriousness of violations of U.S. sanctions against Iran by assigning a base offense level of 26 to the offense. The government respectfully submits that the Court should give considerable weight to the Sentencing Commission's determination when fashioning a sentence in this case.

The application notes to U.S.S.G. § 2M5.1 outline relevant factors courts should consider when evaluating the nature and circumstances of a sanctions violation. Those circumstances are: (1) the degree to which the violation threatened a security interest of the United States; (2) the volume of commerce involved; (3) the extent of planning or sophistication; and (4) whether there were multiple occurrences involved. If any of these are present in an extreme form, a departure may be warranted. U.S.S.G. § 2M5.1, application note 2. Though none of these factors is present in an "extreme form" in this

case, each factor is present; thus, the serious nature of the offense supports the imposition of a prison sentence.

As to the first factor, the defendant's criminal conduct was serious and implicated the security interest of the United States. Strengthening of the economy of a country that supports international terrorism is exactly what the embargo was designed to avoid. *See United States v. Homa Int'l Trading*, 387 F.3d 144, 146 (2d Cir. 2004) ("The "obvious purpose" of the President's Executive Order prohibiting certain transactions with Iran "is to isolate Iran from trade with the United States"). This case did not involve the purchase of ordinary consumer items (i.e., a television) from a United States vendor by an ordinary citizen in Iran. Here, the unlawful scheme was aimed at thwarting the sanctions regime and the defendant repeatedly engaged in a conspiracy that targeted controlled United States technology and caused it to be transshipped from Malaysia to Iran where it could be used by the IRIB, a Specially Designated National and the Government of Iran.

As to the second factor, the volume of commerce involved was not insubstantial. The defendant involved herself in a lengthy scheme to obtain technology from U.S. Companies. The fact that others, including the defendant's co-conspirators and superiors, were more heavily involved than the defendant in the illegal scheme does not detract from the overall volume of the commerce involved.

As to the third factor, the defendants' unlawful scheme required significant planning. The front company, Green Wave, needed to be established in Malaysia and used as the United States-facing entity behind which Fana Moj hid. Using this façade,

defendant Ghodskani and others used a Green Wave email account to inquire of U.S. Companies about pricing and supply of controlled items. The defendants also organized a complicated financial exchange to permit Fana Moj's financial assets – located in Iranian banks and subject to sanctions – to flow to Malaysian banks so that they could be used, apparently legitimately, to buy the equipment Fana Moj sought. Further, the defendants also caused false export documentation to be filed in an effort to conceal this illegal conduct from detection by law enforcement and the U.S. Companies.

As to the fourth factor, the defendant admitted in her guilty plea that she was involved in multiple occurrences of shipping U.S. technology to Iran. Indeed, the transactions involving both U.S. Company 1 and U.S. Company 2 described in the factual basis represent only a small fraction of the business Green Wave did with these companies.

### B.     History and Characteristics of Defendant.

Ms. Ghodskani is a 40 year-old Iranian citizen. (PSR ¶ 45). She grew up in Iran and is well educated, including earning an Masters in Business Administration. (PSR ¶¶ 45, 47). She is married and has a young child. (PSR ¶ 46). In 2012, Ms. Ghodskani left Iran (and her employment with Fana Moj), moved to Australia, and remained there – gainfully employed – until her arrest and subsequent extradition to the United States in 2019. (PSR ¶ 46). She has no known criminal history. (PSR ¶¶ 41). The defendant's intelligence and education, apparently stable and supportive family, and acceptance of responsibility for her crime suggest that the defendant has good prospects for a successful following her release from custody, so long as she remains law-abiding.

### C. The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, and the Need for the Sentence Imposed to Protect the Public.

In this case, there is a need for both individualized and general deterrence. Individualized deterrence is that which discourages a defendant from ever committing such a crime again. General deterrence is the public response necessary to deter other people from committing similar crimes. "Congress specifically made general deterrence an appropriate consideration . . . and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (quoting *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)).

The seriousness of the defendant's crime warrants a sentence that would deter others from undermining U.S. foreign policy and national security interests by flouting export restrictions and sanctions regimes such as those against Iran. Sentences in "white-collar" crime cases – such as this one – can have a substantial deterrent effect, arguably more so than in any other area of criminal law. *See United States v. Bergman*, 416 F. Supp. 496, 500 (S.D.N.Y. 1976) (crimes that are "deliberate, purposeful, continuing, non-impulsive, and committed for profit are among those most likely to be generally deterrable by sanctions most shunned by those exposed to temptation."); see generally, Richard Frase, Punishment Purposes, 58 Stanford L. Rev. 67, 80 (2005); Elizabeth Szockyj, Imprisoning White Collar Criminals?, 23 S. Ill. U. L. J. 485, 492 (1998).

Through its just punishment of the defendant in this case, the Court can send an appropriate message that export violations are – as Congress and the President designed

11

them to be – significant matters that warrant real punishment. In light of the defendant's actions, a serious sentence would serve to communicate the importance with which the United States views its own national security.

### D. The Kinds of Sentences Available, the Need to Avoid Disparities and the Sentencing Guidelines and Related Policy Statements.

The Court should avoid unwarranted sentencing disparities by imposing a term of imprisonment that is in line with the sentence imposed upon Ms. Ghodskani's co-defendant Alireza Jalali. However, the Court should be mindful that Mr. Jalali's sentence included a two-level role adjustment downward based on the minor role he played in this offense. Ms. Ghodskani, as Mr. Jalali's supervisor, deserves no such role adjustment. Indeed, the sentence imposed by the Court should reflect the increased culpability of this defendant when compared to Mr. Jalali.

### IV. CONCLUSION

The government believes that a sentence at or near the Guideline range is appropriate and necessary to satisfy the factors described in 18 U.S.C. § 3553(a).

Dated: September 18, 2019

Respectfully Submitted,

ERICA H. MACDONALD
United States Attorney

s/ Charles J. Kovats, Jr.
_____
CHARLES J. KOVATS, JR.
Assistant United States Attorney

DAVID C. RECKER
Trial Attorney
Department of Justice